IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER ALLEN SICKINGER, | ) | CASE NO. 1:21-CV-327 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Christopher Allen Sickinger ("Plaintiff" or "Sickinger"), challenges the final decision of

Defendant, Kilolo Kijakazi,[1] Commissioner of Social Security ("Commissioner"), denying his applications

for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security

Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.

("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report

and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In February 2017, Sickinger filed applications for POD, DIB, and SSI, alleging a disability onset

date of December 12, 2016 and claiming he was disabled due to bilateral shoulder surgery, bilateral

shoulder labral tear including SLAP, adjustment disorder with mixed features, insomnia, narcolepsy,

depression, bilateral vertigo, PTSD, and memory loss.  Transcript ("Tr.") at 18, 225, 232, 258.  The

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

applications were denied initially and upon reconsideration, and Sickinger requested a hearing before an administrative law judge ("ALJ").  Tr. 167.

On April 10, 2019, an ALJ held a hearing, during which Sickinger, represented by counsel, and an impartial vocational expert ("VE") testified.  Tr. 34-77.  On June 13, 2019, the ALJ issued a written decision finding that Sickinger was not disabled.  Tr. 18-32.  The Appeals Council declined further review and Sickinger filed a complaint in federal court on November 25, 2019.  Tr. 3310.  On July 1, 2020, the Court remanded the case for further proceedings pursuant to a joint stipulation by the parties.  Tr. 3327.

On remand, an Administrative Appeals Judge issued a notice order remanding the case to the ALJ and instructing him to consider Sickinger's hip impairment, including an opinion from examiner Andrew King, M.D.  Tr. 3331.  On November 4, 2020, the ALJ held a second hearing during which Sickinger, his counsel, and a VE testified.  Tr. 3292-3309.  On November 30, 2020, the ALJ issued a written decision finding that Sickinger was not disabled.  Tr. 3264-3278.  Sickinger elected to bypass the Appeals Council and filed a complaint on February 10, 2021, asserting the following assignment of error:

> Whether the ALJ's analyses of Andrew King, M.D.'s Shoulder and Arm Conditions Disability Questionnaire and Hip and Thigh Conditions Disability Questionnaires are supported by substantial evidence.

Doc. No. 13, p. 22.  The parties have completed briefing in this case.  Doc. Nos. 13, 16, 17.

## II. EVIDENCE

### A.    Personal and Vocational Evidence

Sickinger was born in 1985 and was 31 years old on his alleged disability onset date.  Tr. 3277.  He has at least a high school education and has past work as a warehouse manager/infantry operations specialist and security officer.  Tr. 3277, 3295.

2

**B.**     **Relevant Medical Evidence[2]**

In October 2013, prior to his alleged onset date and while he was in the Navy, Sickinger reported a history of shoulder instability that began in 2007.  Tr. 920.  An x-ray of his shoulder showed possible grade 2 acromioclavicular joint injuries with slight widening of the acromioclavicular interval.  Tr. 387.  An x-ray of his right shoulder in July 2014 showed probable old grade 2 acromioclavicular joint separation.  Tr. 386.  After "a significant amount of conservative treatment including physical therapy and activity modification," he underwent surgery on his right shoulder in February 2015 for multidirectional instability and a labral tear.  Tr. 802, 557.  The surgeon discussed the fact that Sickinger had maxed out his time in rehabilitation and Sickinger stated that he was unable to stay in the Navy with shoulder pain.  Tr. 803.  The surgeon advised that "over time generally the laxity returns and he is likely to continue with some aching and pain in his shoulder."  Tr. 803.

In April 2015, Sickinger reported that his right shoulder was doing so well post-op that he would like to have surgery to address his left shoulder instability, which he underwent in June 2015.  Tr. 747, 560.

In May 2016, Sickinger saw his surgeon and reported pain, stiffness, and functional limitations in his shoulders.  Tr. 560.  He reported 7/10 pain with activity.  Tr. 560.  He reported pain reaching away from his body above his shoulders and difficulty lifting greater than 5 pounds and changing into or out of his shirt.  Tr. 560.  He was unable to do pushups and overhead lifting.  Upon exam, he was "able to elevate to approximately 130˚ of forward flexion and approximately 90˚ of abduction" but had pain with anything greater than 90˚.  Tr. 560.  He had pain with resisted supraspinatus and infraspinatus and pain at the end of internal rotation.  Tr. 560.  The surgeon diagnosed him with bilateral shoulder multidirectional instability status post capsular plication with continued pain and functional limitations

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

and wrote, "due to the above diagnoses and functional limitations, I do not feel that Petty Officer Sickinger will be able to return to full duty in the United States Navy."  Tr. 561.

Sickinger continued to seek care for his shoulder pain while in the Navy, including physical therapy in August 2016.  E.g., Tr. 490.

In May 2017, Sickinger saw Dr. Carolyn Kuerbitz at the VA Medical Center ("VA") for various problems, including chronic shoulder pain and low back, hip and knee pain.  Tr. 2504-2505.

On August 28, 2017, Sickinger had a follow up with psychiatry at the VA and stated that he felt like he had been hit by a truck after working in the attic of his family-owned bar for 4 to 5 hours in a small area in the rafters repairing the ceiling.  Tr. 2454-2455.  He helped out in the bar but was not interested in working there.  Tr. 2455.  On September 26, Sickinger stated that he was tired, his low back was hurting 5 minutes after he woke up, and he was barely able to walk.  Tr. 2439.  Upon exam he was observed to have grimaced when he got out of his chair and was observed as being "mildly histrionic."  Tr. 2440.  He was noted to be focused on his somatic complaints "with an emphasis on his inability to work and his need for more income."  Tr. 2441.  He talked about starting a storage unit business.  Tr. 2441-2442.  The same day he requested a pain management consult and x-rays for his complaints of pain in his bilateral shoulders, low back, right hip, and knee.  Tr. 2438.

On September 28, 2017, x-rays of Sickinger's hips showed no significant osseous degenerative changes and mild superior hip joint space loss in his left hip.  Tr. 2211-2212.  X-rays of both shoulders showed no significant degenerative changes; mild elevation of the distal clavicles, slightly more pronounced on the left; surgical changes of both glenoids with mild/mild to moderate joint space loss; and variable appearing alignment of both humeral heads.  Tr. 2215-2216.

On November 6, 2017, Sickinger returned to Dr. Kuerbitz to get a pain management consultation for his back and shoulders.  Tr. 2127.  He complained that his shoulders "get stuck," he has limited

motion, unbearable pain some days, and he takes nothing for the pain other than Motrin.  Tr. 2127.  Dr. Kuerbitz stated that Sickinger was "quite open" about the fact that he thinks he deserves more disability from the military and that he is trying to get more diagnoses so that he can request an increase to a 100% service-connected disability and social security disability.  Tr. 2128.  Sickinger relayed that he did not believe a cardiac stress test performed by the military was accurate; Dr. Kuerbitz ordered a stress test and advised that the results were normal.  Tr. 2131.

On April 9, 2018, Sickinger saw Dr. Brijesh Patadia at pain management complaining of shoulder, hip, and knee pain.  Tr. 1539.  Sickinger relayed his history of bilateral shoulder pain and treatment: that he had plateaued with therapies, regained some range of motion, but still had pain within the joint spaces.  Tr. 1539.  His hips and knees had started bothering him in mid-2017 without an inciting event.  Tr. 1539.  Upon exam of his right shoulder he had no effusion or warmth; nearly full passive and active range of motion with pain during near end-adduction; a positive Hawkin's and O'Brien's sign and empty can test; negative Neer's sign and cross adduction; and external/internal rotation caused mild anterior pain.  Tr. 1542.  His left shoulder exam was similar but his active range of motion was reduced (140˚ and 110˚).  Tr. 1542.  Upon exam of his right hip he had mildly concordant lateral pain over his greater trochanter bursa; mild pain along the iliotibial band; intact range of motion; FABER, FAIR, and log roll with lateral pain; and straight leg raising tests with hamstring tightness.  Tr. 1542.  Upon exam of his left hip he had no pain with palpation, intact range of motion, FABER, FAIR, and log roll with mild inguinal pain, scour with inguinal pain, and straight leg raising test with hamstring tightness.  Tr. 1542.  A McMurray's test of his knees increased his hip pain.  Tr. 1542.  He had a normal gait.  Tr. 1542-1543.  Dr. Patadia prescribed Mobic and physical therapy.  Tr. 1543.

On July 10, 2018, Sickinger saw Nurse Practitioner Joan Briceno to establish care at a different VA center and reported multiple joint pain and low back pain.  Tr. 3014.  Upon exam, he had 5/5

5

strength in his extremities and a limited range of motion in his arms, right greater than left (45˚ abduction). Tr. 3016.

On August 7, 2018, Sickinger had a follow up appointment with Nurse Briceno. Tr. 2976. Upon exam, he had a stable gait and increased joint swelling, tenderness, and pain with range of motion. Tr. 2979. Briceno referred him for a physical therapy consultation. Tr. 2980.

On September 11, 2018, Sickinger had a physical therapy consultation for increasing shoulder, hip and knee pain. Tr. 2952-2953. He was given a TENS unit. Tr. 2953. On October 24, he had a physical therapy evaluation. Tr. 2922. He stated that his pain increased with walking, standing, reaching and lifting. Tr. 2922. His TENS machine provided some relief but prior shoulder therapy had not. Tr. 2922. His pain ranged from 2/10 to 7/10. Tr. 2922. Upon exam, his gait was fair and he had limited range of motion and decreased strength in his hips and knees. Tr. 2923. He was referred to aquatic therapy. Tr. 2923.

On October 26, 2018, Sickinger saw Dr. Andrew King at the VE's request for an evaluation of his impairments and Dr. King completed a Hip and Thigh Disability Benefits Questionnaire. Tr. 2911-2921. Dr. King listed Sickinger's diagnosis as chronic bilateral hip strain diagnosed in 2017 and summarized his medical history. Tr. 2912. He described Sickinger's reports of daily right hip pain, rated 1/10 to 6/10, no swelling, and crepitus with mild pain and "an instability feeling." He rated his left hip pain as 0/10 to 4/10 with no crepitus, swelling, or feeling of instability. His pain was aggravated by increased activity "(walking, standing, running)," cold weather, sitting in certain chairs, lying on either side, carrying, squatting, and twisting. Rest, avoidance, heat and meloxicam helped. He had had no surgery, injections, or chiropractic or acupuncture treatment. Tr. 2912.

Upon range of motion testing, Sickinger's right hip had abnormal flexion to 105˚ (normal 125˚); external rotation to 30˚ (60˚ normal); and extension to 25˚ (normal 30˚). He had normal abduction,

adduction, and internal rotation.  Dr. King stated that abnormal flexion contributed to Sickinger's

functional loss and that pain was noted upon exam.  Tr. 2913.  There was evidence of pain with weight

bearing and mild tenderness to palpation of the lateral portion of his hip.  Tr. 2913-2914.  He had no

crepitus.  Tr. 2914.  His left hip had abnormal flexion to 105˚; external rotation to 30˚; extension to 25˚;

30˚ internal rotation (40˚ normal); and increased abduction and adduction.  There was evidence of pain

with weight bearing and mild tenderness to palpation.  He had no crepitus.  Tr. 2915.

Dr. King also performed repetitive use testing.  Tr. 2915.  Sickinger was able to perform

repetitive use testing with at least three repetitions with his right hip; however, Dr. King noted additional

functional loss of range of motion after three repetitions due to pain, to wit: his flexion decreased from

105˚ to 100˚ and his internal rotation decreased to 35˚.  He had no range of motion loss in his left hip

after three repetitions.  Dr. King did not perform "repeated use over time" testing but, based on

Sickinger's statements, he wrote that his exam was consistent with Sickinger's reports of pain causing

functional loss with repetitive use over time.  Tr. 2915-2916.  Dr. King listed additional contributing

factors of disability in both hips as "disturbance of locomotion, interference with standing."  Tr. 2917.

Dr. King performed muscle strength testing and found that Sickinger had full, 5/5 muscle

strength in both hips (flexion, extension, abduction) and he had no atrophy.  Tr. 2917.  He concluded

that Sickinger's hip impairment impacted his ability to perform work:

> The veteran is currently unemployed since leaving the service in Feb 2017. He does some part-time work at the family's business (a bar). He has difficulty with repeated or prolonged standing, walking, lifting and carrying due to the hips. Sedentary work would be possible from the hip perspective.
>
> Daily activities are somewhat affected. He is awakened from sleep due to pains when laying on either side for a while. He can do self-care, driving up to 2 hours, shopping and light chores with occasional rest breaks. He no longer runs (partially) due to the hips.

Tr. 2919-2920.  Dr. King stated that Sickinger's right hip is more affected than his left hip but there is

evidence of pain in both hips with active and passive range of motion testing and with weight bearing.

7

Tr. 2920.

On October 29, 2018, Sickinger had a neurology consultation for his complaints of memory problems, dizziness, "spacing out events," and insomnia.  Tr. 2845.  The treatment note states that he had been told not to drive but was still driving and that he was not compliant with his medications or his medical appointments.  Tr. 2845.  Upon exam, he had normal muscle tone and bulk, full strength in his deltoids, biceps, triceps, and hips, and a normal gait and station and intact heel-toe and tandem walk.  Tr. 2846.

On November 21, 2018, Sickinger returned to Nurse Briceno for his annual appointment to follow-up on his chronic medical conditions.  Tr. 2887.  Upon exam, he had joint tenderness in his shoulders, knees, and hips, warmth, knee crepitus and swelling, and grossly normal sensory and motor function.  Tr. 2888.

On January 29, 2019, Sickinger attended aquatic physical therapy.  Tr. 3044.  He complained of shoulder and knee pain, rated 4/10.  Tr. 3044.  He reported that he was a Lyft driver and felt sore after driving for more than 17 hours the day before.  Tr. 3044.  He was inconsistent with doing his home exercises.  Tr. 3044.

On February 26, 2019, Sickinger saw Nurse Briceno for a follow up and requested a consultation for new MRIs of his bilateral hips and knees.  Tr. 3076.  Upon exam, he had "tenderness and swelling bilateral hip bilateral knee.  No joint tenderness, warmth, crepitus, or swelling."  Tr. 3077.  An MRI of his hips on March 23 showed increased signal at the bilateral superior labrum concerning for tear, possible partial tear of the right ligamentum teres at the foveal attachment, and mild bilateral gluteal tendinopathy and tiny tears.  Tr. 3221.

On March 26, 2019, Sickinger had a follow-up for his MRI studies; upon exam, he had bilateral hip tenderness and swelling, bilateral knee tenderness and swelling, and increased pain with

8

hyperextension.  Tr. 3233, 3236.

On April 19, 2019, Sickinger saw Dr. King at the VE's request for an evaluation of his shoulder impairments and Dr. King completed a Shoulder and Arm Disability Benefits Questionnaire.  Tr. 3763-3775.  Dr. King listed Sickinger's diagnoses as right shoulder labral tear, including superior labral anterior-posterior lesion ("SLAP") and bilateral glenohumeral joint instability and summarized his medical history.  Tr. 3764.  He wrote that Sickinger "has had some mild progression" of his shoulder symptoms since his discharge and that both shoulders "are about the same."  Sickinger reported daily, constant pain in both shoulders, sometimes painful crepitus, stiffness, easy fatigue, and weakness.  Tr. 3764-3765.  He had had no further dislocations in either shoulder and no swelling or locking.  Tr. 3765.  He rated his right shoulder pain as 3/10 to 6/10 and his left shoulder pain as 2-3/10 to 6-7/10.  He listed aggravating factors as overhead use, repetitive use, lifting, carrying, abduction, reaching back, lying on either side, throwing, quick movements, and weather changes.  Alleviating factors included rest, avoidance, keeping his shoulders close to his body, some stretches, heat, and a TENS unit.  He had had no injections, acupuncture, chiropractic or massage treatments since leaving the Navy.  Tr. 3765.

Upon range of motion testing, both shoulders had restricted range of motion in all areas (flexion, abduction, and internal and external rotation) and testing elicited pain with flexion, adduction, and internal rotation.  Tr. 3765-3767.  There was evidence of pain with weight bearing, crepitus, and tenderness to palpation at the anterior, lateral, and posterior shoulder and distal clavicle.  Tr. 3765-3767.  Sickinger was unable to perform repetitive use testing with at least three repetitions in either shoulder due to pain and fatigue.  Tr. 3767.  Dr. King did not conduct "repetitive use over time" testing, but, based on Sickinger's statements, he wrote that his exam was consistent with Sickinger's reports of pain causing functional loss with repetitive use over time.  Tr. 3767.  With his right shoulder, Sickinger could perform 3-4 repetitions for abduction and flexion and his range of motion decreased by 15˚ flexion and

9

10˚ abduction and he could not perform repetitive use testing for external and internal rotation due to

pain.  With his left shoulder, Sickinger could perform 3-4 repetitions for abduction and flexion and his

range of motion decreased by 5˚ abduction and he could not perform repetitive use testing for external

and internal rotation due to pain.  Tr. 3768.  His functional loss in both shoulders was due to pain,

fatigue, weakness, and lack of endurance, Tr. 3767-3768, and a contributing factor was weakness due to

muscle or peripheral nerve injury, Tr. 3768-3769.

      Dr. King performed muscle strength testing and found that Sickinger had full, 5/5 strength in

both shoulders (flexion and abduction) and no muscle atrophy.  Tr. 3769.  He performed rotator cuff

testing, which showed bilateral positive tests for Hawkins' Impingement Test, Empty-Can Test, External

Rotation/Infraspinatus Strength Test, and Lift-Off Subscapularis Test.  Tr. 3770-3771.  He was positive

bilaterally for a Crank Apprehension and Relocation Test and a Cross-Body Adduction Test.  Tr. 3772.

Dr. King concluded that Sickinger's bilateral shoulder condition impacted his ability to perform

occupational tasks such as standing, walking, lifting, sitting, etc.  Tr. 3774.  He wrote,

> The veteran is currently not working. He occasionally does brief shifts driving for Uber. He also
> will occasionally do light work, working in the family owned bar. He would not be able to
> maintain employment with physical work due to the shoulders. His lack of endurance and pain
> would severely limit physical activity. Sedentary work might be possible from the shoulder
> condition perspective.
>
> Daily activities are significantly affected by the shoulders. He has some pain when sleeping if he
> lays on either shoulder. He has some difficulty dressing when putting on shirts and coats because
> of the shoulders. He can drive up to about 1 hour. He does short shopping trips and a few light
> chores with frequent rest breaks. He has stopped sports, exercise, rock climbing, snowboarding
> and skateboarding due to the shoulders (and other medical conditions).

Tr. 3774-3775.

      On June 20, 2019, Sickinger returned to Dr. King for a re-evaluation of his bilateral hip

impairment at the VA's request.  Tr. 3723.  Dr. King listed his diagnoses as chronic bilateral hip strain

and bilateral hip labral tears diagnosed in March 2019.  Tr. 3724.  Dr. King summarized the changes to

Sickinger's condition since his last exam in October 2018: Sickinger reported some progression in symptoms and MRIs of his hips showed likely hip labrum tears and a possible tear of the right ligamentum teres.  Tr. 3725.  He was doing aqua therapy with modest improvement and he had had no other treatment.  He reported no swelling or locking but a "somewhat painful" crepitus.  He rated his right hip pain as usually 2-3/10; at best 2/10 and at worse 6/10.  His left hip pain was usually 2/10; 2/10 at best and 5/10 at worst.  Aggravating factors included staying in the same position "for a while," prolonged standing or walking, lying on either side, running, cold weather, and some twisting.  Alleviating factors were rest, avoidance, changing positions frequently, use of orthotics, aqua therapy, and sometimes meloxicam.  Tr. 3725.

Upon range of motion testing, Sickinger's hips were more limited than they were in October 2018.  Tr. 3725-3727.  His repetitive use testing improved, such that he did not have additional loss of function after three repetitions.  Tr. 3727.  With respect to repeated use over time testing, Dr. King stated that he did not perform such testing and that his exam findings were neither consistent nor inconsistent with Sickinger's statements describing his functional loss with repetitive use over time.  Tr. 3728.  Dr. King was "unable to say [without] mere speculation" whether pain, weakness, fatigue, or incoordination significantly limited Sickinger's functional ability with repeated use over time.  Tr. 3728.  Dr. King explained that Sickinger's range of motion remained the same except that it had increased by 5˚ after 3-4 repetitions, whereas Sickinger had reported that his range of motion decreased in all planes after repetitive or prolonged use by 5˚ or 10˚.  His bilateral hip strength was full, 5/5, and he had no muscle atrophy.  Tr. 3729-3730.  Dr. King wrote the same narrative regarding Sickinger's limitations as his prior hip exam, *i.e.*, "sedentary work would be possible from the hip perspective."  Tr. 3732.  He added, "The new diagnosis of labral tears would be considered a progression of the previous hip strain diagnoses. This is a common occurrence in musculoskeletal conditions."  Tr. 3732.

11

On July 30, 2019, x-rays taken of Sickinger's shoulders showed tubular lucencies in the bony glenoid; the impression was post-surgical changes, otherwise within normal limits.  Tr. 3475-3476.

On October 9, 2019, Sickinger was referred for physical therapy for his shoulders.  Tr. 3497-3498.  He attended physical therapy in December 2019 and January and February 2020.  Tr. 3503-3504.

## C.    State Agency Reports

On November 28, 2017, Mehr Siddiqui, M.D., reviewed Sickinger's record and opined that he could perform medium work with postural and environmental limitations.  Tr. 85-86.  On March 29, 2018, Maureen Gallagher, D.O., adopted Dr. Siddiqui's opinion.  Tr. 112-114.

## D.    Hearing Testimony

During the April 10, 2019 hearing, Sickinger testified to the following:

- He lives with his dad and stepmom.  Tr. 39.  He has some income from VA disability and he had been driving for Lyft and Uber but he stopped a few months ago when he was diagnosed with psychogenic non-epileptic seizures.  Tr. 40.

- From 2005 to 2015 he was working on logistics and training in the Navy.  Tr. 47-48.  When he was injured in 2015, he trained junior sailors until he was discharged about 2 years later.  Tr. 42.  That job was an accommodation and they "almost completely" eliminated his lifting and carrying because he couldn't use his shoulders.  Tr. 43.

- On a typical day, he wakes up, hangs around in his room and "mess[es] around with my tv or my computer."  Tr. 49.  He tries to help out with chores but he can't do a lot of repetitive "stuff."  Tr. 49.  There is a small carpet downstairs that he helps his stepmom vacuum and by the time he is done his arms are starting to get sore.  Tr. 49.  Once a week he helps his dad with the trash; depending on how his shoulders are he can help "a lot" or "just grab a couple bags and that's it."  Tr. 49.  He can no longer do things he used to enjoy, like skydiving, rock climbing, skateboarding, snowboarding, and riding roller coasters.  Tr. 49-50.  Skydiving and roller coasters put too much pressure on his shoulders.  Tr. 50.  He is afraid to try snowboarding and skateboarding because he knows he will fall and have to try to catch himself with his arms and "that's not going to feel so great."  Tr. 50.

- He used to help his dad at the bar doing mostly "computer stuff."  Tr. 50.  When asked what prevents him from working, he stated that he "can't do almost any physical labor" mostly because of his shoulders, but also his hips and knees having gotten worse recently.  Tr. 52.  Some days he can barely walk around because one of his legs hurts so bad and he can't really move it.  Tr. 52.

- When asked if he can reach overhead with both arms he said no.  Tr. 64.  He can lift his arms to almost shoulder level in front of him but it hurts too bad to try to reach away from his body beyond that.  Tr. 64-65.  When asked if he has problems sitting for extended periods of time he answered "sometimes," and explained that he can sit in a comfortable chair for an hour or so but, longer than that, his right hip starts hurting "pretty good."  Tr. 65.  His ability to stand and walk for extended periods of time is "hit or miss."  Tr. 65.  Most days its fine and he can be on his feet for an hour or so and then he has to take a break and sit down for a little bit.  Tr. 65.  Some days his legs hurt so bad he doesn't get out of bed.  Tr. 65.  If he keeps his arms to his side to lift and carry objects (so the weight is on his biceps rather than his shoulders), he can carry maybe 20-30 pounds a short distance.  Tr. 66.  For instance, he can carry bags of groceries from the car parked near the door to the house, but by the time he gets to the door his arms are exhausted and his shoulders are starting to hurt.  Tr. 66.

- When asked about how he was able to try to open and operate a storage unit business, as he is trying to do, he explained that his dad and stepmom will be helping him.  Tr. 66.

During the November 4, 2020 hearing, Sickinger testified to the following:

- Although he is no longer driving for Lyft or Uber because he was told to stop due to his non-epileptic seizures, he still drives "from time to time, when I need to go to my VA appointments."  Tr. 3294.

- When asked if things had changed for him since the prior hearing, he stated, "we ended up closing our bar" because his grandfather couldn't run it anymore and he couldn't be out there to help his dad run it because of his limitations.  Tr. 3295.  Also, he has not been able to get his storage unit business off the ground.  Tr. 3295-3296.

- When asked about his medical condition, he stated that his joints have gotten a little worse, especially his knees after an injury (he slipped on ice visiting his mother in Colorado), but other than that, everything is pretty much the same.  Tr. 3292, 3297-3298.  When asked if he still does the same household chores as before, he stated that there is little to nothing he can do around the house.  Tr. 3298.  Every now and then he will try and help his dad put away the dishes but normally he can't help him finish before his arms start hurting too much.  Tr. 3298.  He tries to keep up with his laundry.  Tr. 3298.

- When asked about treatment since the last hearing, he stated that he has done a lot of physical therapy for his shoulders, knees, and hips, and there has been talk of surgeries.  Tr. 3299.  When asked if it was more difficult for him to stay on his feet now than it was at the last hearing he stated that when he is on his feet for more than an hour or so he has to sit down.  Tr. 3301.  He described a recent visit to an uncle's cottage when he was standing and talking and after about 45 minutes his body started shaking and he got light-headed from standing that long.  Tr. 3301.

The ALJ confirmed with the VE that Sickinger had past work as a warehouse manager/infantry operations specialist and security officer.  Tr. 3295.  The ALJ asked the VE whether a hypothetical

individual with the same age, education and work experience as Sickinger could perform his past work

or any other work if the individual had the limitations assessed in the ALJ's RFC determination,

described below.  Tr. 3302-3303, 3305-3306.  The VE answered that such an individual could not

perform Sickinger's past work but could perform the following representative jobs in the economy:

general office clerk, inspector, and assembler.  Tr. 3305-3306.

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of

disability and must prove an inability to engage "in substantial gainful activity by reason of any medically

determinable physical or mental impairment," or combination of impairments, that can be expected to

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  A claimant is entitled to a POD only if: (1) he

had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or

within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v.*

*Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must

meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-

stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594

F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant

must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the

disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he

suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c)

*and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to

14

do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Sickinger was insured on the earliest possible disability onset date, December 12, 2016, and remained insured through December 31, 2022, his date last insured ("DLI.").  Tr. 3265.  Therefore, in order to be entitled to POD and DIB, he must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since December 12, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative joint disease of the bilateral shoulders, status post labral tear and arthroscopic capsular plication; idiopathic hypersomnia; psychogenic non-epileptic epilepsy (PNES); and dysfunction of major joints (hips) (20 CFR 404.1520(c) and 416.920(c)).

15

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can frequently reach overhead and in all other directions bilaterally. He can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds. Claimant can frequently stoop, kneel, crouch or crawl. The claimant can never work at unprotected heights or around dangerous moving machinery. He cannot perform commercial driving.

6.      Since December 12, 2016, the claimant has been unable to perform past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on September **, 1985 and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from December 12, 2016, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 3267-3278.

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*

*v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

Sickinger argues that the ALJ's decision is not supported by substantial evidence because his rationale for discounting Dr. King's disability questionnaires regarding his shoulders and hips contains errors of law and fact.  Doc. No. 13, p. 23.  The parties agree that the old regulations regarding opinion evidence control in this case because Sickinger filed his applications prior to March 2017, the effective date of the new regulations.  Doc. No. 13, p. 23, n.10; Doc. No. 16, p. 7.  And Sickinger concedes that Dr. King is not a "treating physician" whose opinion is entitled to "controlling weight" under those former regulations.  Doc. No. 13, p. 30.  Thus, pursuant to 20 C.F.R. §§ 404.1527(c) and 416.927(c), the regulations that govern applications filed prior to March 2017, the ALJ was required to weigh Dr. King's opinions based on the following factors: the examining relationship; the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors.

Dr. King's Shoulder Questionnaire: Sickinger cites four problems with the ALJ's evaluation of

Dr. King's opinion.  Doc. No. 13, p. 24.  The ALJ considered Dr. King's opinion as follows:

> Dr. King examined the claimant again on April 19, 2019, this time evaluating claimant's shoulder and arm conditions. Claimant's diagnoses included labral tear of the right shoulder and glenuohumeral joint instability of both shoulders. Claimant reported no further injuries or surgery to either shoulder since his discharge from the service in 2016/2017. He had mild progression of his symptoms. Claimant said he had daily pain in the shoulders. Claimant had pain and limited range of motion in the shoulders (Exhibit 21F/293-305). Claimant was not working. He occasionally did brief shifts driving for Uber. He occasionally did light work in the family owned bar (Exhibit 21F/304). Dr. King said the claimant could not do physical work due to the shoulders. Lack of endurance and pain would severely limit physical activity. Sedentary work might be possible from the shoulder condition perspective (Exhibit 21F/304-305). I give this opinion little weight because the record does not support the inability to do any work due to the shoulders.

Tr. 3273.  Three pages later, the ALJ added,

> Dr. King, who evaluated the claimant's hip and thigh conditions for the Department of Veterans Affairs on October 26, 2018 (Exhibit 11F/61-71), also saw the claimant later. Dr. King states on different occasions that "sedentary would be possible" based on the hip (Exhibit 21F/262); shoulder (Exhibit 21F/305); vertigo (Exhibit 21F/308); and diarrhea (Exhibit 21F/312). I give these notes little weight. Dr. King does not perform a function-by-function analysis to determine the most claimant can do, but simply states sedentary would be possible. Dr. King is also following VA criteria, which is different from Social Security disability criteria, as noted above.

Tr. 3276.

First, Sickinger argues that the ALJ mischaracterized Dr. King's opinion when he stated, "the record does not support the inability to do any work due to the shoulders," because Dr. King opined that Sickinger might be able to perform sedentary work.  Doc. No. 13, p. 24; Doc. No. 17, p. 4.  But Dr. King had also stated that Sickinger "could not maintain employment with physical work due to the shoulders," a statement that Sickinger ignores.  Tr. 3774-3775.  The ALJ's characterization of that portion of Dr. King's opinion as stating that Sickinger cannot perform any work is accurate.  Moreover, whether a claimant can perform work is an issue reserved to the Commissioner, as Sickinger concedes.  Doc. No. 13, p. 25.  And, as shown above, the ALJ addressed Dr. King's other opinion that sedentary work may be possible.

First, Sickinger argues that the ALJ committed "legal error" when he discounted Dr. King's

19

opinion because Dr. King did not perform a function-by-function analysis to determine the most that

Sickinger can do.  Doc. No. 13, p. 25.  He asserts that an analysis of the most a claimant can do on a

function-by-function basis is the definition of an RFC, which is the responsibility of the ALJ and cannot

be delegated.  While true that the ALJ is tasked with determining a claimant's RFC, it is also true that

the failure of a physician's opinion to include a function-by-function analysis is a proper basis to

discount that opinion.  *See, e.g.*, 20 C.F.R. § 416.927(c)(3) ("Supportability….The better an explanation

a source provides for a medical opinion, the more weight we will give that medical opinion."); *Arthur v.

Colvin*, 2017 WL 784563, at *12-13 (N.D. Ohio Feb. 28, 2017)[3]; *McCoy v. Comm'r of Soc. Sec.*, 356

F.Supp.3d 704, 710-711 (S.D. Ohio 2018).  Moreover, Dr. King's opinion that sedentary work "might

be possible" is not even an affirmative finding.

Third, Sickinger contends that the ALJ's comment—that Dr. King was following VA criteria—

is wrong.  Doc. No. 13, p. 26.  He complains that the ALJ "is attempting to conflate the numerical

ratings contained with [the VA's] service-connected disability decisions and Dr. King's opinion that

Plaintiff is limited to sedentary work."  Doc. No. 13, p. 26.  He asserts, "Dr. King did not rely on any

VA-specific criteria and the VA does not have its own definition of 'sedentary work' that differs from

the Commissioner's definition of sedentary work."  Doc. No. 13, pp. 26-27.  In support, he cites *Withers

v. Wilkie*, 30 Vet.App. 139 (Vet. App. Aug. 10, 2018).  Defendant concedes that the ALJ made a

"factual error" when he stated that Dr. King relied on VA-specific criteria but argues that the error was

harmless because the ALJ's other reasons for discounting Dr. King's opinion were proper.  Doc. No. 16,

p. 8.

---

[3] Sickinger's attempts to distinguish *Arthur* are unavailing.  Doc. No. 17, pp. 1-2.  He states that the opinion at issue in *Arthur* was not from an acceptable medical source, but the court assumed, *arguendo*, that the report was attributed to the claimant's treating physician and still found that the absence of a function-by-function analysis was a "good reason" to reject the opinion.  *Arthur*, 2017 WL 784563, at *12.  Next, Sickinger agrees that the medical opinion in *Arthur* was "too vague" because it didn't list the duration or frequency that the claimant was able to perform listed activities, but Dr. King's opinion that Sickinger "would not be able to perform physical work" and "sedentary work might be possible" is even vaguer.

In *Withers*, the Court of Appeals for Veterans Claims remanded the case to the Board of Veterans' Appeals because, while numerous medical examiners had opined that the veteran could perform "sedentary work," the term "sedentary work" was not defined by VA regulations and the Board did not explain its ruling denying disability.  The court wrote that "sedentary work" was a vague term that "has no independent legal significance" and "was merely the conclusion of an expert medical witness based on particular facts of the case." *Id*. at 142.[4]  The court declined to define "sedentary work" or to adopt the Social Security Administration's definition of it. *Id*. at 148.  So Sickinger's assertion that "the VA does not have its own definition of 'sedentary work' that differs from the Commissioner's definition of sedentary work" is not well taken; while true that the VA does not define sedentary work, one cannot draw an inference that the lack of a definition means that one can supply a definition.  Indeed, *Withers* foreclosed such an approach. *See also Minns v. Wilkie*, 835 F. App'x 1015, 1018, n.4 (Fed. Cir. 2020) (declining the veteran's invitation to adopt the SSA's definition of "sedentary work" in VA disability cases).  Sickinger's statement that "practitioners typically rely on the Commissioner's definition of 'sedentary work' when litigating VA disability claims" is not supported by *Withers* and he cites no further legal authority to support that statement.  Thus, his suggestion that Dr. King meant "sedentary work" as defined by the Social Security regulations lacks merit.  And the ALJ's statement—that Dr. King followed VA criteria—is accurate in that respect.  Even if the ALJ's statement that Dr. King followed VA criteria was error, the ALJ's other reasons, listed above, were sufficient.

---

[4] The court explained,

> [T]he word "sedentary," although clearly having the general sense of sitting, has numerous definitions conveying that sense to varying degrees….Given these varying meanings, an examiner's use of the phrase "sedentary work," by itself, doesn't remove all ambiguities about what the phrase might mean in a given case. And vagueness is especially unhelpful when it comes to TDIU, where individualized assessment is crucial. Does it mean that a veteran can work any job as long as it allows for a lot of sitting? Only a job that entails sitting most of the time? A job that is restricted to mostly sitting and does not require much or any physical activity? As the veteran notes, although both can be described as sedentary work, there is an appreciable difference between the physical demands of a truck driver and a computer programmer.

*Withers*, 30 Vet.App. at 147 (citation to the record omitted).

21

Moreover, elsewhere in his decision, the ALJ remarked that Sickinger had reported driving for more than 17 hours for Lyft in one day, and, although he reported pain afterwards, "the ability to drive for that prolonged a period is inconsistent with his complaints of shoulder, hip and knee pain."  Tr. 3274. The ALJ also commented that Sickinger had testified that he cannot put away dishes because his arms hurt but pointed out that Sickinger "provided periodic maintenance at a bar owned by his father, repairing the air conditioning unit or ceiling, which likely required him to reach away from his body, reach overhead, and lift items in excess of 30 pounds."  Tr. 3271, 3272, 3274.  The ALJ's conclusion that the record reflected daily activities that contradicted Sickinger's statements concerning the intensity, persistence and limiting effects of his symptoms (Tr. 3272) is supported by substantial evidence and is a finding that Sickinger does not challenge.

Fourth, Sickinger complains that the ALJ did not indicate "whether he considered the required factor of supportability in relation to Dr. King's opinion that [he] could perform sedentary work."  Doc. No. 13, p. 27.  In his reply brief, he concedes that that argument references the current regulations, rather than the former ones that govern this case, and that "the failure to specifically discuss supportability is not reversible error."  Doc. No. 17, p. 3.  He then pivots and argues, for the first time, that the ALJ erred because he failed to acknowledge Dr. King's exam findings.  Doc. No. 17, p. 3.  He asserts that the failure to acknowledge "these additional, specific bases for a physician's opinion is grounds for reversal and remand.  *See Frost v. Berryhill*, 2019 WL 3848765 (N.D. Ohio June 14, 2019)[]."[5]  Doc. No. 17, pp. 3-4.  The Court is not required to address that argument because it was raised for the first time in a reply brief.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (an issue raised for the first time in a reply brief is waived).  In any event, the opinions at issue in *Frost* were treating physician opinions and the ALJ was required to provide "good reasons" when discounting them.  2019 WL 3848765, at *17-19.  Here, Dr. King is not a treating physician and the ALJ was not required to provide

---

[5] Report and Recommendation adopted, 2019 WL 3843089 (N.D. Ohio Aug. 15, 2019).

22

"good reasons" for discounting his opinion.

For all the reasons explained above, the undersigned finds that the ALJ's evaluation of Dr.

King's opinion regarding Sickinger's shoulders is supported by substantial evidence.

Dr. King's Hip Questionnaire: Sickinger cites three problems with the ALJ's evaluation of Dr.

King's opinions.  Doc. No. 13, pp. 29-30.  Dr. King evaluated Sickinger's hips twice and the ALJ wrote,

> Andrew King, M.D., examined the claimant for the Department of Veterans Affairs on October 26, 2018 (Exhibit 11F/61-71). Dr. King specifically evaluated the claimant's hip and thigh conditions. Claimant had a diagnosis of chronic bilateral hip strain. Dr. King noted the claimant's gradually increased hip pain with radiation to the knees; abnormal range of motion; pain with weight bearing and tenderness to palpation; and pain and functional loss with flexion. Claimant rated his pain as 0/10 to 4/10 (Exhibit 11F/62-63). Claimant showed normal muscle strength in both hips. There was no muscle atrophy (Exhibit 11F/67). X-rays from September 2017 had not shown any arthritis. There was some mild increased joint space superiorly in the left hip, but it was unclear if this was a significant finding (Exhibit 11F/69). Dr. King concluded that the claimant would have "difficulty with repeated or prolonged standing, walking, lifting and carrying due to the hips" and that "[s]edentary work would be possible from the hip perspective" (Exhibit 11F/70). I give this opinion partial weight. Claimant's reported pain at most was 4/10. Normal muscle strength with no atrophy show the claimant has the ability to stand/walk consistent with light work.
>
> ***
>
> Dr. King, who evaluated the claimant's hip and thigh conditions for the Department of Veterans Affairs on October 26, 2018 (Exhibit 11F/61-71), also saw the claimant later. Dr. King states on different occasions that "sedentary would be possible" based on the hip (Exhibit 21F/262); shoulder (Exhibit 21F/305); vertigo (Exhibit 21F/308); and diarrhea (Exhibit 21F/312). I give these notes little weight. Dr. King does not perform a function-by-function analysis to determine the most claimant can do, but simply states sedentary would be possible. Dr. King is also following VA criteria, which is different from Social Security disability criteria, as noted above.

Tr. 3272-3273, 3276.

First, Sickinger complains that the ALJ's assignment of both "partial weight" and "little weight"

to Dr. King's opinions at different points in his decision "frustrates meaningful judicial review" because

it is not clear whether and how those two descriptions differ.  Doc. No. 13, p. 30.  He submits that "little

weight" is less than "partial weight" and asserts that the ALJ did not provide a reason for downgrading

the second opinion.  Doc. No. 13, p. 30.  The Court agrees that in this context "little weight" is less than

"partial weight" but disagrees that a reason is not apparent.  Dr. King's October 2018 and July 2019 narrative opinions were the same.  Tr. 2919-2920, Tr. 3732.  The ALJ's assignment of "partial weight" included the portion of Dr. King's opinion that Sickinger would have difficulty with repeated or prolonged standing, walking, lifting and carrying due to his hips.  The ALJ explained that Dr. King's opinion was discounted because Sickinger's reported pain at most was 4/10 and he had normal muscle strength and no atrophy.  Thus, while he had limitations, the ALJ found that he had the ability to stand and/or walk consistent with light work.  In contrast, the ALJ's assignment of "little weight" only included the portion of Dr. King's opinion that sedentary work would be possible due to his hips.  Thus, although the ALJ's explanation was not perfect, it is capable of meaningful judicial review.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) (citation omitted) as stating, "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result.").

Sickinger's additional arguments—the ALJ erred when he discounted Dr. King's opinion because it did not include a function-by-function analysis and when he stated that Dr. King followed VA criteria—lack merit for the reasons explained in the section above regarding Sickinger's shoulder impairment.  Thus, the undersigned finds that ALJ's evaluation of Dr. King's opinions regarding Sickinger's hips is supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: February 24, 2022                        *s/ Jonathan Greenberg*
                                               Jonathan D. Greenberg
                                               United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).**